402 F.3d 416
 In re: GENESIS HEALTH VENTURES, INC., Debtor
Genesis Health Ventures, Inc.
v.
Kelly Beaudin Stapleton, Acting United States Trustee for Region 3
In re: Multicare AMC, Inc., Debtor
Multicare AMC, Inc.
v.
Kelly Beaudin Stapleton, Acting U.S. Trustee
Joseph J. McMahon, Jr., Trustee
Genesis Health Ventures, Inc., Multicare AMC Inc., Appellants
In re: Genesis Health Ventures, Inc.; Multicare AMC, Inc., Debtors
Reorganized Debtors Genesis Health Ventures Inc.
v.
Kelly Beaudin Stapleton, Acting U.S. Trustee
Joseph J. McMahon, Jr., Trustee
Genesis Health Ventures, Inc.; Multicare AMC Inc, Appellants.
 No. 03-1225.
 No. 03-2722.
 United States Court of Appeals, Third Circuit.
 Argued June 29, 2004.
 Decided March 31, 2005.
 
 Adam P. Strochak (Argued), Jeffrey L. Cimbalo, Weil, Gotshal & Manges LLP, Washington, DC, Michael F. Walsh, Gary T. Holtzer, Weil, Gotshal & Manges LLP, New York, NY, Mark D. Collins, Russell C. Silberglied, Richards, Layton & Finger, P.A., Wilmington, DE, for Appellants.
 Frank J. Perch III, Assistant United States Trustee, Robert J. Schneider, Joseph J. McMahon, Jr., United States Department of Justice, Office of the United States Trustee, Wilmington, DE, Joseph A. Guzinski, General Counsel, Paul Wm. Bridenhagen, P. Matthew Sutko (Argued), United States Department of Justice, Executive Office for United States Trustees, Washington, DC, for Appellee.
 Before: AMBRO, ALDISERT and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 AMBRO, Circuit Judge.
 
 
 1
 In this bankruptcy appeal, affiliated debtors (approximately 350 in number) filed separate cases under Chapter 11 of the Bankruptcy Code but were permitted to administer their cases jointly. The Bankruptcy Court also permitted them to use a "centralized cash management system" under which a small number of debtors held bank accounts from which the expenses of all other debtors were paid.
 
 
 2
 In this context, two issues are before us. The first is whether the employment of the centralized cash management system affects the amount of quarterly bankruptcy fees each debtor would otherwise owe to the United States Trustee under 28 U.S.C. § 1930(a)(6) in the absence of such a system. This issue, a question of first impression for us, turns on the interpretation of the term "disbursement" under § 1930(a)(6). Specifically, we consider whether payments made by certain debtors on behalf of other debtors constitute disbursements of the paying debtors only or whether those payments must be attributed to the debtors on whose behalf the payments were made. The second issue relates to the duration of payments. Does the obligation for U.S. Trustee quarterly fee payments under § 1930(a)(6) continue after confirmation of the debtors' Joint Plan of Reorganization ("Reorganization Plan" or "Plan") providing in part that they are "deemed consolidated" for certain purposes?
 
 
 3
 The Bankruptcy Court held, and the District Court affirmed, that (1) each debtor was obligated to pay quarterly fees based on the payment of its respective operating expenses regardless whether it actually wrote the checks to pay for these expenses, and (2) the deemed consolidation of the debtors under the Reorganization Plan had no effect on the amount of the quarterly fees payable by each debtor in connection with its own Chapter 11 case still pending. We agree with both Courts on both issues and thus affirm.
 
 I. Factual and Procedural Background
 
 4
 Genesis Health Ventures, Inc. ("Genesis"), Genesis ElderCare Corp. (known for our purposes as "Multicare"), and their affiliates are providers of healthcare and support services to the elderly. On June 22, 2000, Genesis, Multicare, and their affiliates (collectively the "Debtors" and individually a "Debtor") separately filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors simultaneously moved for joint administration of their Chapter 11 cases in two groups — (1) Genesis and its affiliated debtors (the "Genesis Debtors"), and (2) Multicare and its affiliated debtors (the "Multicare Debtors").[1] The Bankruptcy Court granted the Debtors' motions.
 
 
 5
 Because the Debtors planned to continue to operate their businesses as debtors in possession,[2] they also moved for authorization to continue their centralized cash management systems in Chapter 11 — one for the Genesis Debtors, the other for the Multicare Debtors. Under the cash management system each Debtor's revenues were typically deposited into separate accounts. On a periodic basis, the funds in these separate accounts were transferred to a handful of "concentration accounts," then to several "disbursing accounts" held only by Paying Debtors. In turn, these disbursing accounts were used to pay the various financial obligations of each Debtor, such as accounts payable, payroll, and taxes. The Debtors maintained, however, inter-company balances so that each of them was able to account for its own revenues and expenses. On June 26, 2000, the Bankruptcy Court granted the Debtors' motions. In doing so, the Court directed each group of Debtors to "maintain records of all transfers within the cash management system so that all post-petition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors prior to the commencement of these [C]hapter 11 cases."
 
 
 6
 While operating under Chapter 11, the Debtors were required to pay quarterly fees to the U.S. Trustee under § 1930(a)(6).[3] The amount of the quarterly fees payable under § 1930(a)(6) varies depending on the total "disbursements" that a debtor makes during each quarter. The maximum fee that a debtor is required to pay each quarter is capped at $10,000 for disbursements totaling $5 million or more. Id.
 
 
 7
 In little more than a year from the Debtors' Chapter 11 filings until June 30, 2001, they collectively paid $691,250 in quarterly disbursement fees. In calculating these fees, the Debtors treated all disbursements as applicable only to those Paying Debtors who held the disbursing accounts from which they were made. Had fees been paid for the Debtors for whom the disbursements were made, the aggregate quarterly disbursement fees would have been, according to the U.S. Trustee, almost $4.4 million.
 
 
 8
 The U.S. Trustee objected to the Debtors' proposed Reorganization Plan, claiming that they still owed approximately $3.7 million in quarterly fees.[4] Each Debtor, the U.S. Trustee reasoned, owed its respective quarterly fees based on the disbursements attributable to that Debtor, regardless who held the accounts from which actual disbursements were made. After confirming the Reorganization Plan and reserving decision on the proper amount of quarterly fees,[5] the Bankruptcy Court agreed with the U.S. Trustee and ordered the Debtors to pay the deficiency claimed by the U.S. Trustee. The District Court affirmed that decision one year later.
 
 
 9
 For the first quarter after the Reorganization Plan was confirmed — the fourth quarter of 2001 — the Debtors made a single fee payment of $10,000 to the U.S. Trustee, the statutory maximum amount for a single case. The Debtors claimed that the payment of a single fee was justified under the provision of the Reorganization Plan (§ 5.1) that "[d]eemed" the Debtors consolidated "for Plan [p]urposes [o]nly."[6]
 
 
 10
 The U.S. Trustee disputed this, arguing that quarterly disbursement fees should be assessed for each Debtor for its own Chapter 11 case notwithstanding the deemed consolidation provision of the Plan. The Bankruptcy Court again agreed, In re Genesis Health Ventures, Inc., 280 B.R. 95 (Bankr.D.Del.2002), and on appeal the District Court again affirmed.
 
 
 11
 The Debtors appeal the rulings on both the pre-confirmation and post-confirmation fee issues.[7]
 
 II. Discussion
 A. Pre-Confirmation Fees
 
 12
 The Debtors argue that payments made by Paying Debtors should not be allocated to other Debtors for whom the payments were made for the purpose of the § 1930(a)(6) fees calculation. They assert that "disbursement" in that subsection means "actual payment by cash or check." By this logic, payments made on behalf of, but not directly by, Debtors are irrelevant in determining the disbursements of those non-paying entities.
 
 
 13
 When the meaning of a statute is plain, "the sole function of the courts is to enforce it according to its terms." Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). The language of a statute is plain when it "admits of no more than one meaning" and in such a case "the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion." Id.
 
 
 14
 Section 1930(a)(6) provides that "a quarterly fee shall be paid to the United States trustee ... in each case under chapter 11 of title 11 for each quarter ... until the case is converted or dismissed, whichever occurs first." 28 U.S.C. § 1930(a)(6) (emphasis added). It is clear from this language that each Debtor in its respective Chapter 11 case is required to pay its own quarterly fee.
 
 
 15
 As stated previously, the Bankruptcy Court permitted the Debtors to administer their cases jointly and to transfer funds among themselves, allowing the affiliated Debtors to manage centrally their cash flow. For us the practical question is whether the convenience of cash management procedures make "disbursements" under § 1930(a)(6) mean only the literal payments by a Debtor even when they are made for other Debtors. Put another way, is an amount owed by Debtor A, but paid by Debtor B, attributed as a disbursement for U.S. Trustee quarterly fees to A (which would pay absent the cash management order) or B (which did not owe the amount itself but as an operational convenience was making A's payment)?
 
 
 16
 "Disbursement" is not defined in the statute. Thus we interpret the word in accordance with its "ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (citation omitted). "Disburse" is defined as "to expend" or "to pay out." Websters' Third New International Dictionary 644 (1976). Based on this ordinary meaning, the Ninth Circuit Court of Appeals held that indirect payment of a debtor's expenses — i.e., payments made by an unrelated third party to secured creditors of the debtor — are disbursements of the owing debtor and should be included in calculating its quarterly fees under § 1930(a)(6). St. Angelo v. Victoria Farms, Inc., 38 F.3d 1525, 1533-34 (9th Cir.1994).
 
 
 17
 Other courts concur. See In re Central Copters, Inc., 226 B.R. 447, 449-50 (Bankr.D.Mont.1998) (holding that the sale proceeds of the secured property, which were paid directly from the purchaser to a secured creditor, should be included in the debtor's disbursements for the purpose of the fee calculation under § 1930(a)(6)); In re Flatbush Assocs., 198 B.R. 75, 78 (Bankr.S.D.N.Y.1996) (concluding that the rents paid directly by a debtor's subtenants to an apartment cooperative, which satisfied the cooperative fees the debtor owed to the apartment cooperative, are the debtor's disbursements); In re Meyer, 187 B.R. 650, 653 (Bankr.W.D.Mo.1995) ("[D]isbursements subject to quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) are unrelated to who makes the disbursement or to whom the disbursement is made.") (citations omitted); In re Hays Builders, Inc., 144 B.R. 778, 780 (Bankr.W.D.Tenn.1992) ("The ordinary, plain meaning of the statutory language requires that all disbursements, whether direct or through a third party, be included in the calculation of fees due the trustee under § 1930(a)(6).").
 
 
 18
 Here, because the Debtors continued their operations after the bankruptcy filings, they incurred various expenses. Ordinarily each Debtor would have paid its respective quarterly fee to the U.S. Trustee based on the amount of expenses it incurred and paid. The intervening cash management procedures do not change the fact that payments of expenses took place for the account of each Debtor even though those payments occurred indirectly. Indeed, when the Bankruptcy Court granted the Debtors' motions for the continued use of each Debtor group's centralized cash management system, it specifically directed the Debtors to maintain records of all inter-company transfers so that each Debtor could account for all receipts and payments on its behalf.
 
 
 19
 In this context, substance trumps form. Payments made on behalf of a debtor, whether made directly or indirectly through centralized disbursing accounts, constitute that particular debtor's disbursements for the purpose of quarterly fees calculations under § 1930(a)(6). Holding otherwise would allow hundreds of affiliated debtors in Chapter 11 cases to avoid paying fees by having one debtor (or a few debtors) control disbursing accounts. See In re Hays Builders, Inc., 144 B.R. at 780 ("[If] the debtor must physically draw the disbursement check in order for the disbursements to be subject to the quarterly fee, [it would] creat[e] an opportunity to avoid paying the fees by setting up third party disbursing arrangements...."). While the result increases severalfold the quarterly fees the Debtors owe, any remedy is for Congress to fashion and not our Court.
 
 B. Post-Confirmation Fees[8]
 
 20
 The U.S. Trustee's Manual provides that "[s]ubstantively consolidated cases become one case and are subject to only one [§ 1930(a)(6)] fee from the time the substantive consolidation order is docketed." U.S. Trustee Manual, Vol. III at § 3-8.3.3 (Oct.1998). Debtors argue that their deemed consolidation for Reorganization Plan purposes "bears all [the] indicia... of a substantive consolidation," making their post-confirmation trustee fee obligations that of but one entity.[9] Even assuming substantive consolidation permits payment of a single fee, here the reorganized Debtors were not substantively consolidated.
 
 
 21
 Substantive consolidation treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor. Because its effect radically rearranges legal boundaries, assets and liabilities, substantive consolidation is typically a sparingly used remedy for debtors' conduct that blurs separateness so significantly that either the debtors' assets are so scrambled that unscrambling them is cost, time and energy prohibitive or creditors already perceive the debtors as simply a single unit and deal with them so. Yet again form follows substance.
 
 
 22
 Contrast these cases. Debtors' prepetition actions leave no impression of blurring entity separateness. Moreover, § 5.1 of the Plan explicitly does not "affect ... the legal and organizational structure of the Reorganized Debtors" and no one sought substantive consolidation-creditor or debtor. (Indeed, for the most part Debtors are obligated for licensing purposes to maintain separate corporate identities.) But for possibly the merger contemplated by the Plan (the corporate parents of Genesis and Multicare), separate cases filed by the Debtors on the petition date remained the same separate cases after Plan confirmation.
 
 
 23
 All we have is a "[d]eemed [c]onsolidation ... for Plan [p]urposes." For a temporary period, claims against separate Debtors were "deemed filed against the deemed consolidated ... Debtors" and the handling of inter-Debtor claims and cross-Debtor guaranties was simplified. Put colloquially, per the Plan voting and distribution were streamlined. But for "funding distributions under the Plan," deemed consolidation left no effect on the Debtors (including their legal and organizational structures) and the rights of claimholders (including the holders of intercompany claims).
 
 
 24
 The Debtors made clear before the Bankruptcy and District Courts, and reiterate here, that § 5.1 of the Plan does not result in substantive consolidation.[10] They claim instead that because the Bankruptcy Court examined and found justifications for substantive consolidation at the time of Plan confirmation,[11] the resulting deemed consolidation must be a "[t]ype" of substantive consolidation. But factors favoring substantive consolidation, if indeed they existed, are at best inchoate ingredients for a result never made formal. Instead, the Debtors proposed a Reorganization Plan several zip (if not area) codes away from anything resembling substantive consolidation. That Plan, a contract Debtors proposed, now binds them. They got the benefit of the voting and distribution streamlining the Plan's deemed consolidation allowed. But without the collapsing of all the Chapter 11 cases into a single case, the plain language of § 1930(a)(6) requires that each Debtor extant post-confirmation pay quarterly fees until its "case" status ceases.[12]
 
 
 25
 In sum, substantive consolidation was not sought by the Debtors (or anyone else) and in any event was not ordered by the Bankruptcy Court. Nor did the deemed consolidation provisions of the Reorganization Plan result in a de facto substantive consolidation. All pre-confirmation cases (save perhaps the merged parent entities) continued as separate cases post-confirmation. Thus no basis exists for the Debtors to claim that there nonetheless was an effective substantive consolidation for purposes of quarterly fee calculations under § 1930(a)(6). We hold that quarterly fees should be assessed for each Debtor in each case still extant post-confirmation, as the "deemed consolidation" provision of the Reorganization Plan does not affect that assessment.
 
 
 26
 * * * * * *
 
 
 27
 Accordingly, we affirm the District Court's orders upholding the decisions of the Bankruptcy Court.
 
 
 
 Notes:
 
 
 [1]
 Although the Genesis Debtors and the Multicare Debtors are affiliated, they were grouped separately because of separate capital structures
 
 
 [2]
 Their businesses included over 300 nursing centers, 94 pharmacies, and 22 medical supply distribution centers
 
 
 [3]
 This provision provides:
 In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $75,000; $750 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $225,000; $1,500 for each quarter in which disbursements total $225,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $5,000 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $7,500 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $8,000 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $10,000 for each quarter in which disbursements total $5,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.
 28 U.S.C. § 1930(a)(6).
 
 
 [4]
 The U.S. Trustee made its objection under 11 U.S.C. § 1129(a)(12), which provides that "[a]ll fees payable under section 1930 of title 28" must be paid prior to confirmation of a debtor's reorganization plan
 
 
 [5]
 The Court required the Debtors to escrow a sum sufficient to cover the fees claimed by the U.S. Trustee
 
 
 [6]
 Section 5.1 of the Reorganization Plan reads:
 
 
 [5]
 1. Deemed Consolidation of Debtors for Plan Purposes Only
 (a) Subject to the occurrence of the Effective Date, the Genesis Debtors shall be deemed consolidated for the following purposes under the Plan of Reorganization: (i) no distributions shall be made under the Plan of Reorganization on account of the Genesis Intercompany claims; (ii) all guaranties by any of the Genesis Debtors of the obligations of any other Genesis Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any Genesis Debtor and any guaranty thereof executed by any other Genesis Debtor and any joint and several liability of any of the Genesis Debtors shall be deemed to be one obligation of the deemed consolidated Genesis Debtors; and (iii) each and every Claim filed or to be filed in the Reorganization Case of any of the Genesis Debtors shall be deemed filed against the deemed consolidated Genesis Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Genesis Debtors.
 Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan of Reorganization and as set forth above in this Section) affect: (i) the legal and organizational structure of the Reorganized Debtors; (ii) intercompany Claims by and among the Genesis Debtors or Reorganized Debtors; (iii) pre- and post-Commencement Date guaranties, liens, and security interests that are required to be maintained (A) in connection with executory contracts or unexpired leases that were entered into during the Genesis Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan of Reorganization, or (C) in connection with any financing entered into, or New Senior Notes issued, by the Reorganized Debtors on the Effective Date; and (iv) distributions out of any insurance policies or proceeds of such policies.
 Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Genesis Debtors shall not have any effect on the Claims being reinstated and unimpaired in Class G1 of the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims [are] entitled shall be left unaltered by the Plan.
 Subsection "(b)," pertaining to the Multicare Debtors, essentially reads the same as "(a)."
 
 
 [7]
 The District Court had jurisdiction to review the Bankruptcy Court's orders granting the U.S. Trustee's motions pursuant to 28 U.S.C. § 158(a). We have appellate jurisdiction over the District Court's orders under 28 U.S.C. §§ 158(d) and 1291
 An appeal from the District Court's review of the Bankruptcy Court's order is subject to plenary (also called de novo) review. In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir.1999). Moreover, when an appeal involves legal questions that turn on the interpretation of a statutory provision, we exercise plenary review of the Bankruptcy Court's legal determinations. Id.
 
 
 [8]
 The parties do not dispute that § 1930(a)(6), as amended in 1996, authorizes the U.S. Trustee to collect quarterly fees from a Chapter 11 debtor even after confirmation of its Reorganization Plan. By confirmation we mean, of course, its effective date and not when the order is docketed approving the Plan
 
 
 [9]
 As part of the Plan the Genesis and Multicare parent companies merged. Thus each group had the same corporate parent post-confirmation
 
 
 [10]
 The record shows that the Debtors not only failed to move to consolidate substantively their cases but also affirmatively denied that they were making such a proposal. For example, the Debtors' Chief Financial Officer testified during a hearing that the Debtors considered filing a motion for substantive consolidation, but decided not to request such relief because they expected it would disrupt their businesses. As the U.S. Trustee persuasively argues, the Debtors — sophisticated business entities — made a business decision not to pursue substantive consolidation to avoid that disruption
 
 
 [11]
 In its opinion approving the Reorganization Plan,In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr.D.Del.2001), Bankruptcy Judge Wizmur did note various factors that, were substantive consolidation proposed, would have weighed in its favor. They included certain attributes of "substantial identity" among the Debtors, a central cash management system, and that eliminating inter-company claims for distribution purposes would aid certain creditors of Debtor-subsidiaries. Id. at 619. But, in considering the quarterly fee dispute that frames this appeal, Judge Wizmur clarified unequivocally that the continued existence post-confirmation of a Debtor continued that Debtor's § 1930(a)(6) obligations.
 
 
 [12]
 Debtor's argument that the U.S. Trustee's Manual requires a contrary result merits little comment for two reasons. The Manual, to reiterate, provides "substantially consolidated cases become one case" subject to but one post-confirmation quarterly fee. Substantive consolidation never occurred (as noted, it was never requested) in these cases and post-confirmation there was not in fact a single case